**UNITED STATES of America ex rel. Robert KUBAT, Petitioner,**

**v.**

**James THIERET, et al., Respondents.**

No. 87 C 8423.

United States District Court, N.D. Illinois, E.D.

Feb. 25, 1988.

Jonathan Haile, James Craven, P.C., Jane Raley, Asst. Defender, Office of the State Appellate Defender, Fourth Judicial Dist., Springfield, Ill., for petitioner.

Neil F. Hartigan, Atty. Gen., State of Ill. by David E. Bindi and Jack Donatelli, Asst. Attys. Gen., Chicago, Ill., for respondents.

## MEMORANDUM ORDER

BUA, District Judge.

This case presents this court with a rare opportunity to confront some unique and significant legal issues. Pursuant to 28 U.S.C. § 2254(d), petitioner in this case seeks a writ of habeas corpus vacating his convictions and death sentence. His habeas petition marks only the third time since the enactment of the revised Illinois death penalty statute in 1977 that an Illinois defendant has asked a federal district court to overturn a death sentence.[1] After reviewing the superbly articulated arguments presented in petitioner's superlative brief, this court denies the petition with respect to petitioner's conviction, but grants the petition with respect to petitioner's sentence.

## I. BACKGROUND

On June 18, 1980, a jury in Lake County, Illinois found Robert Kubat guilty of the aggravated kidnapping and murder of Lydia Hyde. Following Kubat's convictions, which made him eligible for capital punishment under Illinois law, the State elected to seek the death penalty. The next day, after a capital sentencing hearing, the jury determined that there were no mitigating factors sufficient to preclude a death sentence. Based on the jury's finding, the judge sentenced Kubat to death in accordance with the Illinois death penalty statute, Ill.Rev.Stat. ch. 38, para. 9–1 (1985).

Kubat appealed directly to the Illinois Supreme Court, which affirmed his convictions and sentence. *People v. Kubat*, 94 Ill.2d 437, 69 Ill.Dec. 30, 447 N.E.2d 247 (1983) ("*Kubat I*"). The Court then denied Kubat's petition for rehearing. Shortly thereafter, the U.S. Supreme Court denied Kubat's petition for a writ of certiorari.

[1]. The other two cases of this type were decided just last year. *See Gaines v. Thieret*, 665 F.Supp. 1342 (N.D.Ill.1987); *United States ex rel. Lewis v. Lane*, 656 F.Supp. 181 (C.D.Ill.), *aff'd*, 832 F.2d 1446 (7th Cir.1987).

*Kubat v. Illinois,* 464 U.S. 865, 104 S.Ct. 199, 78 L.Ed.2d 174 (1983).

After failing to obtain relief on direct appeal, Kubat filed a petition for post-conviction relief in the state courts on September 14, 1983. Following an evidentiary hearing, an Illinois circuit court denied the petition. The Illinois Supreme Court then affirmed the lower court's denial of post-conviction relief. *People v. Kubat,* 114 Ill. 2d 424, 103 Ill.Dec. 90, 501 N.E.2d 111 (1986) (*"Kubat II"*). Several weeks later, the state's highest court rejected Kubat's request for a rehearing. Finally, Kubat appealed the state courts' denial of post-conviction relief to the U.S. Supreme Court. The Court denied Kubat's petitions for certiorari, —— U.S. ——, 107 S.Ct. 1634, 95 L.Ed.2d 207 (1987), and rehearing, —— U.S. ——, 107 S.Ct. 2471, 95 L.Ed.2d 879 (1987).

Having exhausted his appeals in the state courts, Kubat now seeks federal habeas relief. In his petition for a writ of habeas corpus, Kubat asks this court to vacate both his convictions and his death sentence.

## II. DISCUSSION

Kubat presents numerous arguments under the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution in support of his petition to vacate his convictions and sentence. With respect to his convictions, Kubat first argues he was denied due process because insufficient evidence was presented at trial to sustain the jury's verdict of guilt beyond a reasonable doubt. Second, Kubat asserts his right to due process was violated when the jury was allowed to hear unreliable testimony by witnesses whose identifications of Kubat at trial resulted from unduly suggestive identification procedures. Third, Kubat argues the deficient performance of his trial counsel resulted in a denial of his Sixth Amendment right to effective assistance of counsel.

In attacking his death sentence, Kubat first claims that his counsel should have requested—and the judge should have presented—an instruction on a lesser included offense, which would have given the jury the option of convicting Kubat of a noncapital crime. Kubat next contends that his attorneys' inadequate performance during the sentencing hearing deprived him of effective assistance of counsel. Third, Kubat asserts that his death sentence cannot stand because the judge erroneously instructed the jury that a unanimous verdict was required to preclude the death penalty. Finally, Kubat argues that the Illinois Death Penalty Act violates the Eighth and Fourteenth Amendments. This court will first address Kubat's arguments concerning his convictions, and then turn to the issues raised regarding his sentence.

### A. *Conviction Phase*

#### 1. *Sufficiency of Evidence at Trial*

The Due Process Clause of the Fourteenth Amendment requires that guilt of a criminal charge be established by proof beyond a reasonable doubt. *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1072–73, 25 L.Ed.2d 368 (1970). Applying this requirement in the context of a habeas action, a reviewing court must view the evidence introduced at trial in the light most favorable to the prosecution and decide whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Unless a petitioner can show that no rational trier of fact could have found him guilty beyond a reasonable doubt, due process is not violated. Although recognizing the foregoing standard places a considerable burden on a petitioner seeking habeas relief, Kubat nonetheless asserts that the State failed to introduce sufficiently reliable evidence to support his convictions.

According to the standards set forth above, this court is first required to examine the evidence offered at trial in the light most favorable to the prosecution. Since Kubat's sufficiency of evidence argument essentially focuses on the alleged unreliability of testimony offered by Carolyn Quick, a review of her trial testimony will be undertaken before addressing the merits of Kubat's assertions. The following summary of Ms. Quick's testimony is ex-

cerpted from the state supreme court's review of the trial record: [2]

In the early afternoon of November 2, 1979, the body of Lydia Hyde was found along a highway in Lake County, Illinois, just one mile south of the town of Kenosha, Wisconsin. The victim had been shot in the back of the head at close range.

The principal prosecution witness at trial was Carolyn Quick, the former wife of Kubat. On November 23, 1979, after seeking the advice of counsel, Ms. Quick surrendered herself to law enforcement officials and admitted participation in the abduction of Mrs. Hyde from a Kenosha tavern known as the Coffee And. In exchange for Ms. Quick's cooperation, the State agreed to dismiss the aggravated kidnapping charge pending against her. At trial, Ms. Quick testified as to the following events.

On November 1, 1979, shortly after returning from a road trip in Iowa, Kubat and Ms. Quick drove in separate cars to the Nugget lounge in Berwyn, Illinois. Kubat was carrying a .38 caliber pistol which he had taken from the home of Ray Flatoff, a man with whom Ms. Quick had been previously living. The two arrived at approximately 11:00 p.m. and consumed a couple of drinks. After the Nugget closed at 12:50 a.m. the two motored to Ed's Grill. Leaving Ms. Quick's car in the parking lot of Ed's Grill, the two departed in Kubat's white 1977 Chevrolet station wagon for Kenosha, Wisconsin.

During the early morning hours of November 2, 1979, Kubat and Ms. Quick parked in the lot of the Kickapoo gas station in Kenosha, and the two napped there until the station opened. After putting the car in order, purchasing gas, and using the washroom, Kubat and Ms. Quick drove to the Chat and Chew diner. Ms. Quick went inside the restaurant by herself, ate a bowl of oatmeal, and ordered two coffees to go. The two then drove through town and stopped at the Back Door restaurant and bar but were informed by a waitress that the restaurant was not yet open. Instead,

the couple proceeded to the Sunnyside restaurant and bar where Ms. Quick ordered a can of grapefruit juice and Kubat an Old Style beer and a shot of Canadian Club ("CC"). Approximately 45 minutes later, the two left the Sunnyside and returned to the Back Door which was then open for business.

Kubat and Ms. Quick entered the Back Door tavern at approximately 11:00 a.m. Kubat, while consuming half of a sandwich, an Old Style beer, and a shot of CC, engaged in a lengthy conversation with the owners of the Back Door, Jesse and Nora Lopez. During the conversation, Ms. Quick commented that Mr. Lopez had "beautiful gray hair." Sandra Lawson, the waitress who had previously informed the couple the Back Door was not yet open, overheard Ms. Quick's comment and humorously responded: "It ought to be pretty, he combs it all the time." Around noon, the couple was asked by Ms. Lawson if they would be staying for lunch, and Kubat stated they would be leaving shortly.

After departing from the Back Door, Kubat and Ms. Quick drove to the Coffee And tavern where Lydia Hyde was alone, bartending. Kubat drank an Old Style and shot of CC; Ms. Quick drank a glass of grapefruit juice. While the two were sitting at the bar, people living above the tavern came downstairs, mixed drinks, and returned to their apartments. After watching Mrs. Hyde place a money bag in the register, Kubat displayed a .38 caliber revolver and ordered Mrs. Hyde to place the money from the register into the bag. At Kubat's direction, Ms. Quick emptied the beer can and glasses on the floor and put them in her purse. Mrs. Hyde was ordered into Kubat's car and seated in the front of the wagon between Ms. Quick, who was driving, and Kubat. At defendant's direction, Ms. Quick drove into Illinois. Kubat told Ms. Quick to stop the car near a road sign and ordered Mrs. Hyde out of the car. Kubat directed Mrs. Hyde to place both hands on the road sign. As she did, Kubat, who was standing behind her, told Mrs. Hyde "she wouldn't feel a

**2.** *See Kubat I,* 94 Ill.2d at 446–67, 69 Ill.Dec. at 33–43, 447 N.E.2d at 250–60.

thing," and fatally shot her in the back of the head.

Kubat and Ms. Quick proceeded to Valentine's restaurant in Stickney, Illinois. After ordering lunch and drinking an Old Style beer and a shot of CC, the two departed for M & D's lounge in Berwyn, Illinois. While at M & D's, Kubat and Ms. Quick saw the owners, Michael and Delores Padgen, and their son Thomas, with whom they were acquainted. Mr. Padgen gave Kubat a package of paper towels that Kubat had previously ordered. While Kubat enjoyed yet another glass of Old Style and shot of CC, he spoke to the Padgens about a play he and Ms. Quick might see later that night. Ms. Quick handed Thomas, who was bartending, the three glasses she had taken from the Coffee And and told Thomas to keep them even though he stated they did not belong to M & D's. Leaving M & D's lounge, Kubat and Ms. Quick returned to Ed's Grill to retrieve Ms. Quick's car and then drove separately to the Brookfield Motel where they spent the night. Kubat left the motel the following morning at about 7:00 a.m. Ms. Quick left about 11:00 a.m. and went to see her friend Joy Jesuit in Chicago. Ms. Quick stayed with Jesuit for a few weeks and saw Kubat every day at Jesuit's tavern.

On November 9 or 10, Kubat and Ms. Quick went to a Goodyear Tire store and purchased new tires for Kubat's Chevrolet wagon. Ms. Quick believed the old tires were in good condition, but acknowledged that on several occasions Kubat had experienced trouble with the rims.

Ms. Quick left Jesuit's residence on November 19 and drove to Ray Flatoff's home in South Bend, Indiana. After telling Flatoff about the kidnapping and murder of Mrs. Hyde, the two visited an attorney, Edward Olczak, who advised Ms. Quick to speak to law enforcement authorities. She did so on November 23, and after several days of investigation, Ms. Quick was taken into custody by Lake County officials.

On cross-examination, Ms. Quick was repeatedly questioned concerning her sleeping arrangements and sexual intimacy with Kubat following their marriage in August 1979. She stated that she did not sleep with Kubat when they lived together with Francine Bejda in Lyons, Illinois. After persistent cross-examination by defense counsel in an attempt to establish that she had lied under oath in an annulment proceeding, Ms. Quick equivocated, conceding the possibility that she and Kubat might have had sex on a night they spent together in a Wyoming motel returning from a trip to Nevada. Ms. Quick further stated that she had phoned the FBI on several occasions in 1979 to report that Kubat was stealing, but never received a satisfactory response. Ms. Quick also admitted that she had once threatened to harm Kubat with a gun.

Kubat asserts that the only evidence linking him to the November 2, 1979 abduction and murder of Lydia Hyde is the testimony of Carolyn Quick, a confessed felon who Kubat asserts threatened his life and whose testimony at trial was premised on promises of nonprosecution by the State. Relying on *Lee v. Illinois*, 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986), Kubat argues that Ms. Quick's ill feelings toward him and obvious motive to implicate him render her testimony presumptively unreliable. Kubat contends that the only evidence substantiating Ms. Quick's testimony came from witnesses who claim to have seen Kubat in Ms. Quick's company near the place and around the time the abduction occurred. However, because Kubat believes the eyewitness testimony offered by these witnesses was rendered unreliable by impermissibly suggestive identification procedures, Kubat argues no independently reliable evidence was offered at trial to support Ms. Quick's assertions. Because Kubat contends Ms. Quick's testimony is presumptively suspect and no reliable corroborating evidence was presented by the State, he concludes that no rational trier of fact could have found him guilty of the charged offenses beyond a reasonable doubt. This court, however, disagrees.

Although Kubat asserts that the decision in *Lee v. Illinois* shrouds Ms. Quick's testimony with a presumption of unreliability, a close examination of that case leads to a

different conclusion. *Lee* involved two co-defendants who were convicted of a double murder after a joint trial at which neither testified. *Id.* 106 S.Ct. at 2057. During its case-in-chief, the prosecution presented, by way of hearsay testimony, a confession given by one of the co-defendants. *Id.* The issue confronted by the Supreme Court was whether the hearsay statement of the nontestifying co-defendant was sufficiently reliable to warrant its admission against Lee in the absence of an opportunity for cross-examination. *Id.* at 2061. Citing the strong motivation of an accomplice to implicate a co-defendant and exculpate himself, the Court ruled that without an opportunity for meaningful cross-examination, a co-defendant's inculpatory statements must be viewed as presumptively unreliable evidence. *Id.* at 2062–63. Unless some sufficient indicia of reliability is shown to rebut the presumption of unreliability, the court opined that admission of the statement through hearsay testimony at a joint trial violates the Confrontation Clause of the Sixth Amendment. *Id.*

The present case differs from *Lee* in several respects. First, unlike *Lee*, the inculpating evidence in the instant case was presented through the direct testimony of an accomplice and not a third-party hearsay witness. Second, Kubat had a meaningful opportunity to cross-examine the witness offering inculpating testimony. By virtue of her leniency agreement with the State, Ms. Quick waived her Fifth Amendment privilege and answered all questions asked by Kubat's counsel. Finally, while Kubat relies on general considerations of due process in asserting the presumptive unreliability of Ms. Quick's testimony, the holding in *Lee* rests on the Confrontation Clause of the Sixth Amendment.

 Although due process is violated when a conviction is obtained through the use of unreliable evidence, due process does not mandate that a presumption of unreliability attach to the inculpating testimony of an accomplice when the accused is given a meaningful opportunity for cross-examination. As a general rule, the uncorroborated testimony of an accomplice is not

*per se* unreliable and is sufficient to sustain a conviction unless patently incredible. *United States v. Evans*, 697 F.2d 240, 245 (8th Cir.), *cert. denied*, 460 U.S. 1086, 103 S.Ct. 1779, 76 L.Ed.2d 350 (1983); *United States v. Watson*, 677 F.2d 689, 691 (8th Cir.1982); *United States v. DeLos Santos*, 625 F.2d 62, 63 (5th Cir.1980). As long as the accomplice testimony is not unbelievable on its face and the jury is instructed to regard the incriminating testimony with care, credibility—not admissibility—is the issue. *Evans*, 697 F.2d at 245–46. What weight will be accorded such testimony is a decision which rests with the jury. *Id.*

Under this rule, if Ms. Quick's testimony is capable of belief by a rational person, then the jury was entitled to credit her testimony with whatever weight it deemed appropriate. Nothing about Ms. Quick's testimony concerning the abduction and murder of Lydia Hyde is "so contrary to the laws of nature and human experience that no rational person could believe it beyond a reasonable doubt." *Wilcox v. Ford*, 813 F.2d 1140, 1141 (11th Cir.1987). Quite to the contrary, Ms. Quick's testimony provides a rational explanation of events leading to the abduction and murder of the victim. Accordingly, this court is unable to find Ms. Quick's testimony facially incredible. As made clear by this court's review of evidence offered at trial, Ms. Quick's testimony alone was sufficient to support Kubat's conviction. Thus, if the jury chose to believe Ms. Quick despite the fact she admitted participation in Mrs. Hyde's abduction, harbored great animosity toward Kubat, and testified pursuant to a leniency agreement, sufficient evidence to support Kubat's conviction existed.

Recently, however, the Seventh Circuit opined that accomplice testimony in a murder prosecution may be inherently unreliable. *United States ex rel. Miller v. Greer*, 789 F.2d 438, 446 (7th Cir.1986) (*en banc*), *rev'd*, —— U.S. ——, *Greer v. Miller*, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987). In *Miller*, the issue was whether the prosecutor's reference at trial to the accused's silence at the time of arrest violated the accused's right to a fair trial under *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91

(1976). *Miller*, 789 F.2d at 442. Determining the prosecutor's statements resulted in a *Doyle* violation, the court addressed whether the error was harmless beyond a reasonable doubt. *Id.* Reasoning that the only evidence linking Miller to the charged murder was the testimony of a confessed accomplice who testified pursuant to a plea agreement, the court observed:

> There was no reason to find Miller's testimony particularly incredible or [the accomplice's] testimony particularly credible on this point, especially since accomplice testimony of this kind is inherently unreliable, often motivated by factors such as malice toward the accused and a promise of leniency or immunity. In short, this evidence does not approach the overwhelming evidence needed to overcome constitutional error such as a *Doyle* violation.

*Miller*, 789 F.2d at 446.

Granting certiorari, the Supreme Court reversed, finding the prosecutor's reference to the accused's silence after arrest did not amount to a *Doyle* violation. Although the Seventh Circuit's decision was reversed, the Supreme Court never addressed the circuit court's statement regarding the unreliability of accomplice testimony in murder prosecutions. This court recognizes that the circuit court's statements must be read in the context of its opinion and are of questionable precedential value. Thus, it is doubtful that the Seventh Circuit's observations in *Miller* apply to the present case. Yet, even if language in *Miller* suggests that a presumption of unreliability attach to Ms. Quick's testimony, the same result would be reached.

■ At Kubat's trial, the State presented numerous witnesses whose testimony corroborated that of Ms. Quick. Rhonda Meeker recalled seeing a couple napping in a white station wagon parked in her Kenosha service station lot the morning of November 2. Nick Bastian, a bartender at the Sunnyside bar in Kenosha, stated he served an Old Style beer and shot of CC to a man who accompanied Ms. Quick the morning of November 2.

Michael and Delores Padgen, who owned M & D's bar, and their son Thomas stated they saw Kubat and Ms. Quick at their tavern in the late afternoon of the day in question. Delores Padgen testified that the couple had told her they were in Wisconsin that day. Thomas Padgen stated that Ms. Quick gave him three glasses which did not match those used at M & D's and told Thomas to keep them. Thomas identified People's Exhibit 10 as one of those glasses. Subsequently, Julie Lewis, owner of the Coffee And, identified People's Exhibit 10 as one of the types of glasses she used at her bar.

The most important corroborating testimony offered by the State came from three witnesses who identified Kubat as the man they saw in the Back Door bar at 11:00 a.m. on November 2. Jesse and Nora Lopez, owners of the Back Door, testified that Kubat and Ms. Quick were in the bar for about 45 minutes and ordered a sandwich and drinks (an Old Style beer and shot of CC). Jesse conversed with the couple for 20–25 minutes during their visit. Sandra Lawson, a waitress at the Back Door, also recalled seeing the couple in the tavern on the day in question and recalled part of the conversation they were having with Jesse Lopez.

Kubat complains, however, that the in-court identifications made by Lawson and the Lopezes were rendered unreliable by impermissively suggestive identification procedures. As a result, Kubat contends their testimony should not be considered in determining whether the State's evidence was sufficient to sustain a guilty verdict.

For reasons detailed later in this opinion, this court is unable to accept Kubat's arguments concerning the identification procedures employed in this case. However, even without the in-court identifications by Lawson and the Lopezes, the testimony offered by the above-mentioned witnesses makes clear that sufficient corroborating evidence was presented at trial to rebut any presumption of unreliability regarding Ms. Quick's testimony. As such, this court finds that sufficient evidence was presented at trial to sustain Kubat's convictions.

## 2. *Identification Procedures*

Kubat argues that his Fourteenth Amendment due process rights were violated when the state court failed to suppress the identification testimony of three prosecution witnesses despite the fact identification procedures employed by police created a substantial likelihood of misidentification and no reliable basis for their in-court identification testimony existed. Kubat's arguments center on a series of photographic arrays displayed to Jesse Lopez, Nora Lopez, and Sandra Lawson at the Back Door bar. Kubat essentially contends that the suggestive procedures used by police in obtaining his identification combined to render the witnesses' identification testimony unreliable.

■ In reaching the conclusion that the witnesses' identification testimony was reliable and properly admitted, the state supreme court made certain findings of fact regarding the events preceding the witnesses' pre-trial identifications of Kubat. See *Kubat I*, 94 Ill.2d at 468–71, 69 Ill.Dec. at 43–46, 447 N.E.2d at 260–63. Whether identification procedures are so suggestive that a substantial likelihood of misidentification exists and whether subsequent in-court identifications are rendered unreliable are mixed questions of law and fact. *Sumner v. Mata*, 455 U.S. 591, 596–97, 102 S.Ct. 1303, 1306–07, 71 L.Ed.2d 480 (1982). In the context of a § 2254 action a reviewing court is required to accept all factual findings made by the state court which are fairly supported by the record. 28 U.S.C. § 2254(d)(8). Thus, while this court is entitled to review *de novo* the constitutionality of the challenged identification procedures and in-court identifications, the state court's factual findings, if supported by the record, must be accepted as correct. Below are the relevant findings of fact made by the Illinois Supreme Court:

> Detective Wayne Myhre testified that he went to the Back Door bar on November 26, 1979, while investigating the murder of Lydia Hyde. He interviewed Mr. and Mrs. Lopez and Sandra Lawson and showed each potential witness a photographic display to determine whether they could identify people who were in the bar the morning of the preceding November 2. Each individual was interviewed separately and shown the display without any other person in the immediate vicinity. The display consisted of five color Polaroid photographs of identical size. (People's exhibit No. 2). Each photograph had a different color background; four were close-ups depicting a man standing against a solid wall ranging from a facial view to a nearly full chest view; the photograph of defendant was somewhat unclear, not a close-up, and depicted a full frontal view with defendant standing in a living room next to a television and a couch, with a picture hanging on a wall in the background. Defendant was the only man wearing glasses.

> Detective Myhre testified that Jesse Lopez, who looked at the photographs one at a time, stated that the photograph which pictured defendant looked like the male of the couple that was in his tavern on November 2, 1979. The officer also testified that Nora Lopez identified that photograph of defendant, stating that "she was as sure as she could be" that he was the man who was in the bar, although he agreed on cross-examination that she did not say she was absolutely certain.

> Finally, the officer interviewed Sandra Lawson, who made a tentative identification of defendant's photograph. She stated that the photograph of defendant appeared to be the man.

> Sergeant Roger Douma, also investigating the murder, went to the Back Door bar on November 29 and interviewed Jesse Lopez. It was his recollection that he and Mr. Lopez were the only two people present. Sergeant Douma was aware of the fact that Mr. Lopez had previously viewed photographs. Sergeant Douma showed Mr. Lopez seven black and white photographs of different men; all were mug shots. (People's exhibit No. 4). One individual was pictured with eyeglasses; defendant was not. Mr. Lopez identified defendant.

On February 26, 1980, Sergeant Douma again went to the Back Door bar, where he showed another photographic display to Sandra Lawson and Nora Lopez. He interviewed Sandra Lawson first at the north end of the bar; Nora Lopez was at the south end of the bar during this interview. Sergeant Douma asked Sandra Lawson to carefully view the photographic display (People's group exhibit No. 3) consisting of seven black and white mug shots of different men, one of whom was pictured wearing eyeglasses while defendant was not. She did so, identifying the photograph of defendant, but then indicated that she was concerned that she might have recognized the photograph because she had seen it in the newspaper.

Sergeant Douma subsequently interviewed Nora Lopez at the extreme north portion of the bar. She, too, identified the photograph of defendant as the man who was in the bar with a woman in early November. Sergeant Douma thereafter wrote on the photograph, "Nora Lopez positively [identified] this photo"; he also initialed the photograph and dated it.

Jesse Lopez, testifying at the hearing, made an in-court identification of defendant. He was positive that defendant was the man in his bar on November 2. It was Mr. Lopez' testimony that he had initially viewed the black and white photographic display. He testified that he had not read a newspaper account of the abduction and murder of Lydia Hyde before the officer initially interviewed him. Nora Lopez also identified defendant at the hearing as the man who was with a woman at the Back Door bar the morning of November 2. She testified that she was not certain of her initial photographic identification; she could not recall her exact words to the officer.

Sandra Lawson testified at the hearing that a middle-aged couple was in the Back Door bar on the morning of November 2. She pointed to defendant in the courtroom and said, "I think that's him there, but I'm not sure." She further testified that she had viewed two different photographic displays on separate occasions. She could not recall the details of the viewings. She indicated, however, that she initially picked out a photograph and said, "I believe this man was in here with this woman." She recalled that, in February 1980, she had told the officer that she was not certain whether she was influenced by what she had read and seen in the newspaper.

*Kubat I,* 94 Ill.2d at 468–71, 69 Ill.Dec. at 43–44, 447 N.E.2d at 260–61.

■ As an initial matter, Kubat argues that the state court failed to acknowledge certain key facts reflected in the record which bear on the propriety of the identification procedures employed. The law is clear that when a state court opinion fails to include legally significant facts, the state court findings, to the extent of such omissions, are not fairly supported by the record. *Dickerson v. Alabama,* 667 F.2d 1364, 1368 (11th Cir.1982). Thus, the first question raised is whether the state court opinion disregards facts which are material to the issues surrounding Kubat's identifications.

The first alleged material omissions concern statements made by Detective Myhre. According to Kubat, the state court failed to observe that Detective Myhre acknowledged that Kubat's color photograph was "distinctively different" than others included in the first array. Tr. at 127. Kubat also asserts the state court ignored Detective Myhre's testimony that neither Sandra Lawson nor the Lopezes were able to positively identify Kubat's photograph from the initial display. P.C. Tr. at 351–53. The second alleged material omission concerns testimony offered by Nora Lopez in which she acknowledges that she was unable to make a positive identification after viewing the first photo array. Tr. at 303, 1328. Finally, Kubat notes that although the state court opinion properly states that the three witnesses were each shown a subsequent photo display, the opinion fails to observe that he was the only individual who was common to all three arrays.

With regard to Kubat's contentions regarding Detective Myhre's testimony, this

court is unable to agree that the state court opinion failed to recognize that differences between Kubat's photo and the others included in the first display existed. As the foregoing excerpt demonstrates, the state court specifically noted that Kubat's photo differed in format from the others and that Kubat was the only person pictured wearing glasses. Whether Detective Myhre acknowledged Kubat's photo was "distinctively different" is of little significance. This court, like the state court, was able to examine the photographs at issue and to discern that differences existed. Simply stated, the detective's characterization reveals nothing that an examination of the photographs does not.

Detective Myhre's testimony regarding the witnesses' inability to positively identify Kubat after the first photo display is also of little importance. The state court opinion recognizes that none of the three witnesses could positively identify Kubat from the first array. Myhre's testimony is merely repetitive of these findings. The same is true concerning the testimony of Nora Lopez. Through the testimony of Detective Myhre, the state court observed that Nora Lopez was not absolutely certain Kubat's picture revealed the same man who was in her bar on November 2. Moreover, the opinion noted Nora Lopez' testimony that she was not certain of her initial photographic identification.

■■■ Kubat's final contention, however, has merit. The fact that Kubat's photographs were the only ones common to each of the three arrays was not discussed in the state court opinion and is material to the alleged suggestiveness of the subsequent displays. *See Simmons v. United States*, 390 U.S. 377, 383, 88 S.Ct. 967, 970–71, 19 L.Ed.2d 1247 (1968). As such, this fact will be considered in analyzing the challenged photographic identification procedures.

In *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972–73, 18 L.Ed.2d 1199 (1967), the Supreme Court recognized that where identification procedures are so impermissibly suggestive that a very substantial likelihood of an irreparable misidentifi-

cation exists, introduction of evidence derived from such procedures may violate due process. Under this analysis, "[r]eliability is the linchpin in determining the admissibility of identification testimony...." *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977). In *Manson*, the court articulated a two-step analysis for determining the admissibility of identification testimony. First, the accused must show that the procedures employed by police in obtaining a pre-trial identification were unduly or unnecessarily suggestive. *Id.* at 105–14, 97 S.Ct. at 2248–53. A finding of impermissible suggestiveness can stem from a single event or the combined effect of a series of events. *See Foster v. California*, 394 U.S. 440, 442–44, 89 S.Ct. 1127, 1128–29, 22 L.Ed.2d 402 (1969). Second, if such a showing is made, the court must determine in light of the totality of circumstances whether the proposed identification testimony is independently reliable. *Manson*, 432 U.S. at 114, 97 S.Ct. at 2253. In conducting this analysis, the court must balance the suggestiveness of the procedures employed against any indicia of reliability surrounding the identification. *Id.* So long as the totality of circumstances does not indicate a very substantial likelihood of irreparable misidentification, no constitutional impediment to the admission of the identification testimony exists. *Id.* at 116, 97 S.Ct. at 2254.

Under the first prong of the *Manson* test, Kubat argues that the combination of identification procedures used by police was unnecessarily suggestive. Kubat first points to the fact that his picture differed in format from others contained in the first collection of photographs and emphasizes that he was the only individual pictured wearing glasses. Kubat asserts that the variations in lighting, background and pose between his photo and the others had the effect of singling him out. Similarly, Kubat argues the fact he was the only person pictured wearing glasses is significant because prior to exhibiting the first photographic array, police knew the suspect had been described as wearing glasses. Kubat contends these factors had the effect of

strongly suggesting to the identifying witnesses that he was the man they had seen in the Back Door bar on November 2. Kubat asserts the procedures used during the first array mirror those found unnecessarily suggestive in *United States v. Fernandez*, 456 F.2d 638 (2d Cir.1972) and *United States ex rel. Cannon v. Montanye*, 486 F.2d 263 (2d Cir.1973).

In *Fernandez*, shortly after a bank robbery, police obtained descriptions of the assailants from eyewitnesses and received 17 photographs depicting the robbers from surveillance cameras in the bank. *Fernandez*, 456 F.2d at 639. Both the photographs and the witnesses' descriptions indicated one of the suspects was a lightly-skinned black man with an Afro. Police compiled a six-photograph array of black men including a picture of Fernandez. *Id.* Despite the police officers' knowledge the suspect was nearly white in skin tone, only one of the six photographs depicted a lightly-skinned black with an Afro. *Id.* Fernandez' photograph was identified by the witnesses. *Id.* Noting the absence of any additional photographs in the array which even remotely resembled Fernandez, the court found the identification procedure unnecessarily suggestive. *Id.* at 641–42. Given that police had surveillance photographs which clearly depicted the physical features of the suspects and no exigent circumstances existed, the court determined police should have included at least another picture of an individual approximating Fernandez in skin color and hairstyle. *Id.*

The decision in *United States ex rel. Cannon v. Montanye* focused on possible suggestiveness in conducting a corporeal line-up. *United States ex rel. Cannon v. Montanye*, 486 F.2d at 266–68. Days after the rape of a woman, police arrested Cannon at his home and instructed him to wear a green sweater. *Id.* at 266. Because the victim had been grabbed from behind and raped with her skirt over her head, the victim was only able to describe her attacker as a black male wearing a green shirt. *Id.* at 267. At a line-up consisting of six black males, the victim identified Cannon as her assailant, noting that like her attacker, Cannon wore a green garment. *Id.* Cannon objected to the line-up arguing it was impermissibly suggestive since he was the only one told to wear green. *Id.* Because the record was silent concerning whether Cannon was indeed the only man at the line-up wearing green clothing, the circuit court remanded the case for an evidentiary hearing. *Id.* at 268. In doing so, the court implied that if Cannon was the only one wearing green, it would find the line-up unnecessarily suggestive. *Id.* at 267.

This court is unable to agree that the procedures used in conducting the first photo array in the instant case are analogous to those found unduly suggestive in *Fernandez* and *Cannon*. In *Fernandez*, the court placed great emphasis on the fact that police possessed numerous photographs precisely depicting the skin tone and hair style of the assailant before conducting the photographic line-up. Because the bank photographs revealed the skin tone of the robber was nearly white and police failed to include any photographs even remotely resembling that of Fernandez, the photo display was found unnecessarily suggestive. Similarly, the request that Cannon wear green before appearing in a line-up, when the victim was only able to describe her assailant as a black male wearing a green shirt, rendered the identification procedure suggestive. Here, the simple fact that Kubat was the only person pictured in the first array wearing glasses does not arise to any significant level of suggestiveness. No suggestion is made that the man in the Coffee And was described as wearing any particular type of glasses which would have cued witnesses to Kubat's photo. Moreover, contrary to Kubat's claim of suggestiveness, the manner in which Kubat appears in the first display more likely had an opposite effect. The picture of which Kubat complains shows a smiling man in a plaid shirt and light blue pants standing in what appears to be a living room next to a couch and television. Admittedly, Kubat's photo, which appears the type taken by a family member or friend, differs from the other

four photographs which resemble mug shots. Yet, this court is unable to see how these particular distinguishing characteristics could have had the effect of suggesting Kubat was the culprit. If anything, the format of Kubat's photo reduced the likelihood he would be selected by the witnesses. Moreover, because the quality of Kubat's photograph is rather poor, it is nearly impossible to discern Kubat's facial features. Given this fact, little surprise exists that none of the witnesses were able to positively identify Kubat's photograph at the first array. As such, this court fails to find the first photo display unduly suggestive.

■ Kubat next contends the subsequent arrays shown to Lawson and the Lopezes were impermissibly suggestive. First, Kubat notes that his photograph was the only one to be repeated in each of the three collections. Because the witnesses were only able to offer tentative identifications after the first display, Kubat contends repetition of his photograph in the new arrays significantly increased the chance that subsequent identifications would be based solely on recognition from the earlier showing. Second, Kubat observes that the photograph of him used in the subsequent arrays, a black and white mug shot, differed from the picture in the first collection. The change in the nature of the photographs, Kubat believes, had the impermissible effect of suggesting to the witnesses that he had been arrested and was considered a suspect in the case. Finally, Kubat argues that the subsequent photographic showings should not have been conducted because after receiving tentative identifications, proper procedure dictated that a corporeal line-up, not a photo line-up, be conducted.

■ In certain circumstances, the possibility of a mistaken identification is increased where witnesses are shown collections of photographs in which the picture of a single individual recurs. *Simmons v. United States*, 390 U.S. 377, 383, 88 S.Ct. 967, 970–71, 19 L.Ed.2d 1247 (1968). The danger inherent in repetitious showings of a particular photograph is the likelihood

that an identification will result from recognition of a particular individual's photograph rather than the witness' recollection of the actual assailant. *Id.; United States v. Eatherton*, 519 F.2d 603, 608 (1st Cir. 1975). Generally, this danger is enhanced when it is shown that a witness was equivocal on the first showing and later became firm after viewing subsequent arrays in which only the photograph of one individual recurs. *United States v. Higginbotham*, 539 F.2d 17, 23 (9th Cir. 1976). In such cases, a line-up, when possible, is the preferable procedure. *Id.*

■ However, the fact that photographs of particular individuals are the only ones common to successive photo arrays does not automatically render identification procedures unnecessarily suggestive. While repetition of any one person's photograph in a subsequent array may not be advisable, the danger of a mistaken identification is substantially reduced when different photographs are used and particularly where the second photograph differs greatly from the first. *United States v. Olson*, 730 F.2d 544, 545–46 (8th Cir.1984). In *Olson*, after a witness was unable to make an identification after viewing a collection of photographs in which the defendant was pictured, the witness was shown a second photographic array containing a different picture of the defendant. *Id.* at 545. The photograph contained in the second collection differed from the one used in the first in that the second pictured the defendant wearing his toupee while the first did not. *Id.* The witness identified the defendant after the second photographic showing. *Id.* at 546. Although the defendant was the only individual pictured in both displays, the court ruled that the significant differences between the two photographs substantially reduced any chance the identification resulted from viewing defendant's photo in the first array. *Id.* As such, the court ruled the identification procedure was not unnecessarily suggestive. *Id.*

*Olson* is strikingly similar to the situation in the present case. The photograph of Kubat used in the first array bears

minimal resemblance to the black and white mug shot included in the two later showings. From all outward appearances, the two pictures show different men. Comparing the two photographs, this court is convinced no likelihood existed that the witnesses based their subsequent positive identifications on anything but their recollections of Kubat on November 2, 1979. Thus, this court finds that the repetition of one of Kubat's photographs in the subsequent arrays was not impermissibly suggestive.

This court also rejects Kubat's contention that a family photo rather than a mug shot should have been used in the subsequent showings to avoid suggesting to the witnesses he had been arrested. The very act of conducting a photographic line-up suggests to a witness that police have reason to believe one of the individuals shown committed the crime. The simple fact that a mug shot rather than a family photo of a particular individual is used in subsequent photographic displays does not render the showings suggestive. *Cf. United States v. Love,* 692 F.2d 1147, 1150–51 (8th Cir.1980) (use of mug shot showing date of arrest proximate to time of crime held not unduly suggestive).

■ Similarly, the fact that a corporeal line-up could have been conducted instead of the subsequent photo showings does not necessarily render the photographic identification procedures impermissibly suggestive. Although the Illinois Supreme Court stated that as a matter of Illinois procedure, the availability of a corporeal line-up after the tentative identification of Kubat rendered the subsequent photographic showings improper, no similar rule exists under the Due Process Clause. *United States v. Allison,* 616 F.2d 779, 783 (5th Cir.1980) "Whether other more desirable methods of identification (e.g., a line-up) were available, or whether there was a compelling need for speedy identification are ... not relevant to a determination of the impermissibly suggestive issue." *United States v. Sutherland,* 428 F.2d 1152, 1156 (5th Cir.1970), *cert. denied,* 409 U.S. 1078, 93 S.Ct. 698, 34 L.Ed.2d 668 (1972). Accordingly, this court does not find the procedures employed by police in conducting the photographic showings were impermissibly suggestive.[3]

■ However, even assuming the identification procedures were unduly suggestive, the witnesses' identifications of Kubat were nonetheless reliable. The factors to be examined in determining the reliability of identification testimony are: (1) the witness' opportunity to view the criminal; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty the witness exhibited at the time of identification; and (5) the length of time between the crime and the showing. *Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977); *Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972).

Little dispute exists that the witnesses in question had an excellent opportunity to view Kubat while he was in the Back Door bar on November 2. Jesse Lopez spoke with Kubat and Ms. Quick for approximately 20 to 25 minutes at a distance of four feet. He recalled portions of the conversation and commented that Kubat reminded him of a movie star because of the dimple in his chin. Nora Lopez and Sandra Lawson also viewed Kubat and Ms. Quick for a significant portion of the 45 minutes the two spent at the Back Door. The witnesses' attention was drawn to the couple because they were strangers in a bar frequented almost exclusively by regular pa-

---

**3.** Based on the premise the photographic procedures were unnecessarily suggestive, Kubat assails the validity of his in-court identifications on the ground they resulted from an impermissible show-up occurring at a suppression hearing. Kubat essentially asserts that the risk of a mistaken identification was greatly enhanced when witnesses' first opportunity for a corporeal viewing of him was a one-person show-up at a pre-trial hearing. Because this court concludes that the photographic identification procedures were not impermissibly suggestive, Kubat's show-up argument fails. Contrary to Kubat's assertions, due process does not require that a corporeal line-up be conducted prior to allowing identification witnesses to view the accused at a suppression hearing.

trons. The fact that Kubat engaged in a lengthy conversation with some of the witnesses obviously required that their attention focus on him. Moreover, the witnesses were able to accurately recall several details of the incident—what the couple ordered to drink and eat, where the couple sat, and when they arrived and departed. These facts all indicate the witnesses were quite attentive while they viewed Kubat and Ms. Quick. Since the record does not indicate that the witnesses were ever asked to furnish a description of Kubat prior to viewing the photographs, this factor appears irrelevant.

As with the first two considerations, the level of certainty exhibited by the witnesses identifying Kubat favors a finding of reliability. Though the witnesses were unable to positively identify Kubat after viewing the initial array, little significance can be attached to this fact because the photograph of Kubat used in that display was blurred. Given the poor quality of Kubat's photograph, the witnesses gave the strongest indication possible under the circumstances that Kubat's photo depicted the man they saw on the day in question. The results of the subsequent showings bolster this conclusion. After viewing the black and white mug shot of Kubat contained in the later arrays, the witnesses positively identified Kubat. Although Sandra Lawson expressed concern when viewing the later array that her identification of Kubat may have resulted from seeing his picture earlier in a newspaper, these facts were disclosed to the jury and thus bore on the weight of the in-court testimony, not its admissibility. The length of time between observation and identification in this case is not insubstantial. Approximately 24 days passed between the time the witnesses observed Kubat and when they tentatively identified him. Although Jesse made a positive identification on November 29, 1979 after viewing a subsequent array, Nora Lopez and Sandra Lawson were not shown a second display until February 26, 1980. Thus, with regard to Nora Lopez and Sandra Lawson, approximately four months intervened between the incident and the identification.

The foregoing discussion indicates that three of the four factors relevant to the identifications in this case weigh favorably for a finding of reliability. Although the time elapsed between the observation and identifications in this case cannot be construed as a factor enhancing trustworthiness, the fact that four months may have passed before a positive identification was made by some of the witnesses is insufficient to render the identification testimony unreliable. Here, the witnesses had an excellent opportunity to observe Kubat, were attentive while he was in their presence, and expressed a high level of certainty that Kubat was the man they had seen. Weighing the indicia of reliability against the possible suggestiveness of the procedures employed, this court is compelled to find the identification testimony of Sandra Lawson, Jesse Lopez, and Nora Lopez reliable.

### 3. *Effective Assistance of Counsel at Trial*

Finally, Kubat attacks his conviction on the ground that he was denied effective assistance of counsel at trial. The standards applicable to a Sixth Amendment claim of ineffective assistance of counsel are articulated in the Supreme Court's decision in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). According to *Strickland,* the test for effective assistance of counsel has two prongs. First, the defendant must show his attorney's performance "fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. at 2064. In making this determination, *Strickland* instructs that a court indulge in a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689, 104 S.Ct. at 2065. Second, the defendant must show that the deficient performance prejudiced his defense. *Id.* at 687, 104 S.Ct. at 2064. Under this prong, the "defendant must show that there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceedings would have been different." *Id.* at 694, 104 S.Ct. at 2068. Because a defendant is required to meet both elements of the test, a court need not address "whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Id.* at 697, 104 S.Ct. at 2069. With these standards in mind, this court turns to Kubat's arguments.

Kubat asserts four instances of allegedly deficient performance stemming from the guilt phase of his trial: (1) counsel's failure to call three witnesses who would have offered testimony supporting his alibi defense; (2) counsel's failure to present evidence to establish that a tire track found near the victim's body could not have been made by the tires on Kubat's car, and thus his disposal of an old set of tires after the murder did not reflect consciousness of guilt; (3) counsel's failure to impeach Ms. Quick with testimony regarding her reputation for dishonesty; and (4) counsel's failure to elicit from witnesses at the Coffee And bar that they saw a car leaving the parking lot which did not resemble Kubat's vehicle.

### a. *Failure to Call Alibi Witnesses*

■ Kubat first argues that his counsel's failure to call Margie Elea, Charles Fleisig, and Francine Bejda was professionally irresponsible and severely prejudiced his defense. Margie Elea, according to her testimony during Kubat's state post-conviction hearing, stated that she was working at a Highland, Indiana gas station the evening of November 1, 1979. Ms. Elea testified that at approximately 10:30 p.m. that evening, she observed a man she later identified as Kubat enter the gas station with a young dark-haired woman in her twenties. Kubat asked Ms. Elea to call a tow truck because his car had broken down. Ms. Elea stated Kubat was driving a white station wagon. After Ms. Elea informed Kubat she had attempted to summon help, Kubat returned to his car. She stated that Kubat remained in his car when her work shift ended at 2:00 a.m. Ms. Elea also testified that she had been contacted by Kubat's attorneys and was subpoenaed to testify at Kubat's trial but was never called.

Charles Fleisig, the second alibi witness Kubat asserts should have been called, died before the post-conviction hearing was held. However, prior to his death, Mr. Fleisig executed an affidavit in which he states he was with Kubat at a Chicago tavern on November 2 at the time the abduction and murder occurred. The record indicates that prior to trial, Mr. Fleisig was interviewed by defense counsel, but efforts to find him and present him as a witness at trial were unsuccessful.

Finally, Kubat argues his girlfriend, Francine Bejda, should have been called to offer testimony on his behalf. At the post-conviction hearing, Ms. Bejda testified that she was with Kubat the evening of November 1 until about 8:00 p.m. Ms. Bejda stated she next saw Kubat the following morning sometime between 6:00 and 8:00 a.m. Ms. Bejda asserted that she and Kubat went to pick up a rent assistance check from her caseworker, Nancy Schultz, and then went to "Lil's bar" where they saw Charles Fleisig. When Lillian Tesnohlidek, the owner of the tavern, refused to cash the rent assistance check, Ms. Bejda and Kubat went to a second bar where the bartender agreed to accept the check. After leaving the second tavern a short while later, Ms. Bejda testified that she and Kubat spent the rest of the day in each other's company.

On cross-examination, Ms. Bejda admitted that at the time of Kubat's trial, she was uncertain as to the date she and Kubat did the above-described activities. She also stated she had been in close contact with Kubat's attorneys prior to trial and had helped supply names of possible defense witnesses. Ms. Bejda testified that through memory reconstruction and hypnosis or deep relaxation techniques, she had been able to arrive at the dates of November 1 and 2.

Examining counsel's decisions regarding these witnesses, this court is reminded that "strategic choices made after thorough investigation of law and facts relevant to

plausible options are virtually unchallengeable." *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066. The foregoing testimony makes clear that Kubat's counsel spoke to each of the three witnesses concerning the testimony they could offer on Kubat's behalf. Kubat's attorneys elected to call only one of the three witnesses to testify at trial. However, that witness, Mr. Fleisig, could not be located before the defense rested. These facts indicate that Kubat's counsel conducted a reasonable inquiry into several possible sources of alibi testimony and believed the testimony of only one would be useful at trial. Thus, the strong presumption applicable to informed strategic choices attaches to counsel's decisions regarding these witnesses.

Kubat takes the position that the testimony each of the three witnesses would have offered on his behalf was "absolutely critical" to establishing his alibi defense. Therefore, Kubat argues that counsel's failure to call Ms. Elea and Ms. Bejda and inability to locate Mr. Fleisig were egregious and inexplicable errors. This court is unable to agree.

The theory of defense advanced at trial was that on November 2, Kubat was not in Kenosha with Ms. Quick, but instead spent the day with his girlfriend, Ms. Bejda, in Chicago. The alibi defense was presented primarily through the testimony of three disinterested witnesses who claim to have seen Kubat in Ms. Bejda's company on the day in question. Nancy Schultz, a caseworker with the Lyons Township General Assistance Department, testified at trial that she first met Ms. Bejda in early October 1979 when Ms. Bejda applied for rent assistance. Ms. Schultz stated that the application was approved on October 29, and three or four days later, Ms. Bejda came to the assistance office to pick up her first check. The check, which was entered into evidence, was made payable to Robert Kubat because Ms. Bejda's application listed him as her landlord. Ms. Schultz recalled that Ms. Bejda was accompanied by a man fitting Kubat's description who waited outside her office. The date on the rent assistance check was November 2, 1979.

Lillian Tesnohlidek, who owned the Starclub tavern in Chicago, testified at trial that she had been acquainted with Kubat for six or seven years and that Kubat's brothers lived in the neighborhood in which her bar was located. On November 2, at approximately 10:30 a.m., Ms. Tesnohlidek stated that Kubat and a woman entered her bar. Kubat ordered a few drinks and began a conversation with a bar patron by the name of Charles Fleisig. Kubat then gave Ms. Tesnohlidek the rent assistance check and asked if she would cash it. Ms. Tesnoholidek testified that she refused, and Kubat and the woman left shortly thereafter.

Finally, Mario Brajkovich, owner of the Lawndale lounge in Chicago, was called to testify for the defense. Mr. Brajkovich testified that Kubat, with whom he had been acquainted for some years, came into his bar on November 2 accompanied by a dark-haired woman. Although Mr. Brajkovich could not identify the lady who was with Kubat, he was familiar with Ms. Quick and was positive she was not the woman. Mr. Brajkovich stated he cashed the rent assistance check for Kubat and identified his endorsement on the back of the instrument.

The testimony of Ms. Schultz, Ms. Tesnohlidek, and Mr. Brajkovich placed Kubat in Chicago with Ms. Bejda on November 2 at the time the victim was abducted and murdered. Little doubt exists that Kubat's counsel employed the strategy of establishing Kubat's alibi through the use of neutral witnesses and documentary evidence. In light of these facts, Kubat's assertion that Ms. Elea, Ms. Bejda, and Mr. Fleisig were absolutely essential to establishing his alibi defense is without merit.

Kubat argues that Ms. Elea's testimony concerning his whereabouts on the evening of November 1 would have undercut Ms. Quick's testimony that she and Kubat had traveled to Kenosha in the early morning hours of November 2. Although this may be true, this court does not believe Kubat's counsel committed a "grevious and incomprehensible" error in choosing not to offer Ms. Elea's testimony.

Counsel's strategy focused on placing Kubat in Chicago on November 2 at the time he was allegedly in Kenosha. Counsel's election to not establish Kubat's whereabouts the night before the crime was not an unreasonable trial strategy. Had Ms. Elea testified, questions would have been raised concerning the identity and whereabouts of the woman who was allegedly with Kubat on the evening in question. Significantly, Kubat does not assert that his attorneys were ineffective for failing to call the young dark-haired woman to testify on his behalf. Moreover, Ms. Elea's testimony at the post-conviction proceedings raised some doubt that November 1 was in fact the date she observed the incidents she described. Since Ms. Elea's testimony might have raised more questions for the defense than it would have answered and counsel's apparent strategy in limiting the alibi defense to Kubat's whereabouts on November 2 cannot be labeled professionally irresponsible, this court is unable to find that Kubat has rebutted the presumption that his counsel's conduct in not calling Ms. Elea fell "within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065.

▮▮▮ Although Kubat asserts that by the very nature of his defense, Ms. Bejda's testimony was indispensable, this court also concludes that counsel's disinclination to offer her testimony was an acceptable trial strategy. As previously noted, counsel attempted to establish Kubat's alibi through the testimony of neutral witnesses. Given the magnitude of the charges Kubat faced and the nature of the relationship the two shared, counsel could have well decided her testimony may have been received unfavorably by the jury. Especially significant is the fact that at the time of trial, Ms. Bejda was uncertain about the exact date Kubat accompanied her to the public assistance office and the two Chicago taverns. Kubat's counsel could have easily concluded that her uncertainty about the date might lead the jury to believe the events to which the other alibi witnesses testified occurred on a different day. Accordingly, counsel's conscious decision to omit Ms. Bejda's testimony was reasonable trial strategy.

▮▮▮ Finally, counsel's inability to locate Mr. Fleisig prior to submitting the case to the jury did not deny Kubat effective assistance of counsel. Kubat asserts that his attorneys acted negligently in failing to timely notify Mr. Fleisig his presence in court would be required. However, whether counsel were in fact negligent in locating the witness and whether such failure constituted professional error need not be addressed as Kubat is unable to demonstrate prejudice. Mr. Fleisig had nothing significant to add to the testimony of Ms. Tesnohlidek, the owner of the Starclub, who testified Kubat came in to cash the rent assistance check on November 2. Counsel are not ineffective for failing to present cumulative evidence. *Brogdon v. Blackburn,* 790 F.2d 1164, 1168–69 (5th Cir.1986). Accordingly, this court concludes counsel's failure to present the testimony of Ms. Elea, Ms. Bejda, and Mr. Fleisig did not deprive Kubat of his right to effective assistance of counsel.

### b. *Failure to Present Tire Track Evidence*

Kubat next focuses on counsel's failure to present evidence negating the inference that tire tracks found near the victim's body originated from Kubat's car. At trial, the State unsuccessfully attempted to link certain tire tracks found at the murder scene to Kubat's vehicle. The State also presented evidence that Kubat drove his car to a Goodyear dealer on November 10, and purchased five new tires. During the opening portion of the State's closing argument, no mention was made of the tire track evidence or of Kubat's tire purchases. However, during Kubat's closing argument, counsel highlighted the fact that no evidence was presented connecting Kubat's car to the tire tracks. In doing so, defense counsel made the following argument concerning Kubat's purchase of new tires: "If a man was worried about being caught with some tires and he bought new tires on November 10, would he carry them around in the back of the station wagon? On

November 19, would he go to Allstate and make an insurance claim?" Tr. at 1596. During the rebuttal portion of its closing, the state argued that Kubat disposed of the old tires, even though they were usable, to avoid detection. At Kubat's post-conviction hearing, an adjuster for Allstate Insurance Company testified that he examined Kubat's old tires and found them to be made by Uniroyal. According to a stipulation entered into by the parties, Uniroyal tires could not have made the tire tracks found near the victim.

Kubat contends that his counsel's failure to present the insurance adjuster's testimony at trial allowed the State to forcefully argue that disposal of old tires indicated consciousness of guilt. Such an omission, according to Kubat, was professionally deficient. Kubat asserts that in the absence of the consciousness of guilt argument, a reasonable likelihood existed he would have been acquitted.

This court is unable to accept Kubat's argument because irrespective of whether professional error occurred, prejudice cannot be established. As demonstrated by the State's treatment of the consciousness of guilt argument, the tire track and tire purchase evidence was not particularly compelling. The State mentioned it during closings only in response to the defense argument that the tire evidence showed nothing. More importantly, however, the State's case rested on testimony by Ms. Quick, who witnessed the crime, and several individuals who saw Kubat in Ms. Quick's company near the place and time the abduction and murder occurred. Given the weight of this evidence and the ambiguous nature of any inference which may have been drawn from the tire tracks, this court is unable to find a significant probability that but for the tire evidence, a different verdict would have been reached. As such, this court rejects Kubat's argument that his trial counsel were deficient for failing to establish that Kubat's vehicle did not make the tire tracks found near the victim's body.

### c. *Failure to Impeach Ms. Quick*

Kubat assails the competency of his trial counsel for failing to present witnesses whose testimony would have called into serious question Ms. Quick's ability to communicate the truth. Citing the testimony of twelve witnesses called at his post-conviction hearing, Kubat argues that Ms. Quick maintained a reputation as a notorious liar and that counsel made no effort to communicate that fact to the jury. Because the State's case hinged on the truthfulness of Ms. Quick's testimony, Kubat contends that presentation of such impeachment evidence could have easily led the jury to reject her testimony and find him not guilty.

During Kubat's post-conviction proceedings, an identical argument was addressed by the Illinois Supreme Court. Rejecting the contention counsel were deficient for failing to present reputation witnesses at trial, the court reached the following conclusion:

> In view of the strong impeachment evidence that was, in fact, elicited (e.g., her animosity toward defendant, her threat to kill him, her testimony in exchange for immunity, the fact that she may have lied to annul her second marriage to defendant and her attempt to have defendant arrested on a previous occasion), we conclude that defendant was not prejudiced by defense counsel's decision not to introduce evidence of her reputation.

*Kubat II,* 114 Ill.2d at 435, 103 Ill.Dec. at 94, 501 N.E.2d at 115. This court agrees with the Supreme Court's conclusion. Trial counsel's decision to impeach Ms. Quick's testimony without resorting to reputation witnesses was a reasonable trial strategy. As noted above, Kubat's attorneys established a variety of reasons why the jury should not credit Ms. Quick's trial testimony. The fact the jury, in spite of this evidence, chose to believe Ms. Quick does not render counsel's decision to omit reputation evidence professionally irresponsible or impermissibly prejudicial.

All of the witnesses who testified at Kubat's post-conviction hearing concerning Ms. Quick's veracity stated that they were

good friends of Kubat. Experience teaches that individuals who are close friends or associates of a party are the least desirable impeachment witnesses because of the ease with which their testimony can be discredited. *See* Lane, *Goldstein Trial Technique* § 20.87 (3d Ed.1986) (advising that persons closely related or associated with a party should not be used to impeach the character of an opposing witness). Kubat notes that some of the reputation witnesses stated they were also friends of Ms. Quick. However, such assertions of friendship could have easily been called into question after hearing these witnesses' derogatory comments concerning Ms. Quick. Given the number of alternative methods counsel employed in impeaching her testimony and the advisability of using only impartial witnesses to attack the veracity of an opposing witness, Kubat's attorneys were not deficient for refusing to attack Ms. Quick's reputation for honesty.

d. *Failure to Present Evidence Concerning a Gray Sedan Seen Leaving the Scene of the Abduction*

■ Kubat's final assertion of ineffective assistance on the part of his trial attorneys stems from counsel's alleged failure to elicit testimony from two prosecution witnesses, Dale Gonsky and Dorothy Hawley, that they observed a gray Chevrolet Monte Carlo sedan in the parking lot of the Coffee And around the time of the victim's disappearance. At the post-conviction hearing, Kenosha County Deputy Sheriff Paul Burnette testified that on the day of the abduction, Mr. Gonsky reported seeing what appeared to be a gray sedan, possibly a Chevrolet Monte Carlo, in the parking lot of the Coffee And shortly before the victim disappeared. Further, the parties stipulated that if called at the post-conviction hearing, Ms. Hawley would testify that she saw a car leaving the parking lot spitting gravel, and that she subsequently picked a two-door Monte Carlo from an automobile identification manual as resembling the car she saw that day. Kubat argues this testimony was critical to the outcome of his trial because it would have raised serious doubts concerning Ms. Quick's testimony that Kubat's white station wagon was used

as the getaway vehicle. As such, Kubat contends that the failure to bring out this testimony during cross-examination was deficient and prejudicial.

Analyzing Kubat's assertions, this court begins with a review of trial counsel's efforts to cross-examine Ms. Hawley and Mr. Gonsky. As earlier noted, Mr. Gonsky testified on direct examination that on November 2 at 12:30 p.m., he saw a couple sitting at the bar of the Coffee And with Mrs. Hyde bartending. When he returned to the bar from his upstairs apartment a short while later, Mr. Gonsky stated that the bar was empty and Mrs. Hyde was gone. Later that afternoon, Mr. Gonsky recalled speaking to police. On cross-examination, Mr. Gonsky was repeatedly questioned about his discussion with police concerning a car he had seen in the parking lot of the Coffee And. After substantial cross-examination, Mr. Gonsky admitted that he first told police he had observed a dark gray car parked outside the tavern.

Next, Dorothy Hawley testified that she was also in the apartment over the Coffee And that day. She too came downstairs at 12:30 p.m. and saw the victim bartending with two people sitting at the bar. On cross-examination, she admitted telling police she had seen a dark gray car departing from the Coffee And when the victim was discovered missing.

Although Kubat argues that defense counsel failed to elicit testimony concerning the sighting of a gray Monte Carlo, the record indicates counsel tried, but the witnesses equivocated regarding their earlier statements. The upshot of Kubat's argument is that counsel failed to establish testimony that witnesses saw a car dissimilar to his rapidly departing from the Coffee And at the time the victim disappeared. This is simply not true. Though the witnesses were not specifically asked about the type of vehicle they observed, defense counsel did all they could to highlight the fact that a grayish blue rather than a white car was seen leaving the scene of the abduction. Given that defense counsel's cross-examination of Ms. Hawley and Mr. Gonsky was sufficient to bring this fact to

the jury's attention, Kubat's assertion of deficiency is without merit. As such, this court rejects Kubat's Sixth Amendment arguments and finds Kubat's attorneys rendered effective assistance of counsel at trial. Accordingly, Kubat's petition to vacate his convictions is denied.

### B. *Sentencing Phase*

#### 1. *Jury Instruction on Lesser Included Offense*

■ In his initial challenge to his death sentence, Kubat contends that the jury that convicted him should have received an instruction on a lesser included offense. Kubat correctly observes that the State could not have sought the death penalty in his case without first obtaining a felony conviction.[4] In convicting Kubat of the felony of aggravated kidnapping, the jury did not consider the possibility that he had committed the lesser included offense of unlawful restraint. If the jury had found Kubat guilty of unlawful restraint rather than aggravated kidnapping, the jury's verdict would have precluded the State from pursuing a death sentence. Because the jury never received an instruction concerning the lesser included offense, Kubat asserts that his sentence should be overturned. His argument on this issue takes two forms. First, Kubat contends that his trial counsel rendered ineffective assistance by failing to request an instruction on unlawful restraint. Second, he argues that the trial judge should have instructed the jury *sua sponte* about the lesser included offense. This court rejects both contentions.

Counsel's failure to tender an instruction on the lesser included offense does not amount to ineffective assistance. As the Illinois Supreme Court observed, "such an instruction would have been inconsistent with [Kubat's] alibi defense"; thus, counsel's failure to offer the instruction "appears to have been a matter of trial strategy." *Kubat I*, 94 Ill.2d at 485–86, 69 Ill. Dec. at 51, 447 N.E.2d at 268. The subsequent affidavit of Arthur O'Donnell corroborates this conclusion. O'Donnell, one of Kubat's attorneys at trial, has stated that Kubat's lawyers never considered asking the judge to instruct the jury on the lesser included offense because Kubat had consistently maintained that he was not in Wisconsin at the time of the crime. Kubat's attorneys could have reasonably believed that tendering an instruction on a lesser included offense would have weakened Kubat's alibi defense. Under these circumstances, "[t]he decision not to request a lesser included offense instruction falls within the wide range of reasonable professional representation." *Woratzeck v. Ricketts*, 820 F.2d 1450, 1455 (9th Cir. 1987).

■ In light of this strategic decision by Kubat's counsel, the trial judge acted properly by not instructing the jury *sua sponte* on the lesser included offense. Kubat claims that due process required the judge to offer the instruction to the jury regardless of whether the parties had asked for it. On the contrary, no federal court has yet imposed a constitutional obligation on a trial judge to present a lesser included offense instruction that neither party has requested.[5] Confronted with this

---

4. Under the Illinois death penalty statute, the State cannot seek the death penalty unless the jury finds the existence of a statutory aggravating factor beyond a reasonable doubt. Ill.Rev. Stat. ch. 38, para. 9–1(b), (g) (1985). In Kubat's case, the jury supplied the required aggravating factor when it convicted Kubat of the felony of aggravated kidnapping. *See id.* ch. 38, para. 9–1(b)(6)(c).

5. In arguing for *sua sponte* instruction, Kubat relies exclusively on *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). *Beck* held that a state could not prohibit the use of jury instructions concerning lesser included offenses in capital cases. The *Beck* Court, however, never reached the issue presented by the

instant case: whether due process mandates *sua sponte* instruction on lesser included offenses. On that issue, the federal courts have remained silent.

Arguably, Illinois law requires *sua sponte* instruction on lesser included offenses in certain instances. In *People v. Joyner*, 50 Ill.2d 302, 278 N.E.2d 756 (1972), the Illinois Supreme Court reversed defendants' murder convictions, ruling that the trial court should have *sua sponte* instructed the jury on the lesser included offense of voluntary manslaughter. In *Joyner*, however, defendants had tendered an instruction on voluntary manslaughter (albeit an instruction that incorrectly stated the law). Thus, defendants put the court on notice that they desired a lesser

judicial vacuum, this court questions the wisdom of establishing a precedent for *sua sponte* instruction in the instant case. Such a ruling would compel the judge to present jury instructions at odds with the trial strategy of Kubat's counsel. *Cf. Bashor v. Risley*, 730 F.2d 1228, 1240 (9th Cir.1984) (trial judge did not act improperly in failing to instruct jury on lesser included offenses, because defendant had not requested such instructions, and defense counsel objected to their use). Given the strategic considerations involved, the trial judge did not violate Kubat's due process rights when he failed to instruct the jury on a lesser included offense.

### 2. *Ineffective Assistance of Counsel at Sentencing*

Kubat also challenges his sentence on the ground that his lawyers provided ineffective legal assistance during the sentencing phase of his trial. Applying *Strickland*'s two-prong test to counsel's performance at sentencing, this court concludes that Kubat did not receive the effective assistance of counsel to which the Sixth Amendment entitles him.

### a. *Deficient Performance*

In the wake of *Strickland v. Washington, supra,* a criminal defendant cannot prevail on a claim of ineffective assistance of counsel unless he satisfies two requirements. Under *Strickland*'s first prong, the defendant must establish that his counsel's performance was "deficient," that it "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687–88, 104 S.Ct. at 2064. With respect to his sentencing, Kubat easily carries this burden. As he points out, three glaring examples of defective legal representation marred his sentencing. First, Kubat's lawyers neither investigated potential mitigating evidence before trial nor presented any mitigating evidence at the sentencing hearing. Secondly, defense counsel's bizarre closing argument enhanced rather than reduced the likelihood that the jury would impose a death sentence. Finally, Kubat's attorneys failed to object when the judge erroneously instructed the jury that imposition of a sentence other than death would require unanimous juror approval.

### i) Failure to Investigate or Present Mitigating Evidence

Although the constitutional inadequacy of Kubat's counsel first became evident at his sentencing, the seeds of ineffectiveness had been sown before the trial even commenced. Despite the prospect that the State might seek the death penalty for Kubat, his attorneys made little or no effort to seek out potential mitigating evidence before trial. Reasonable pre-trial investigation, however, would have uncovered a substantial amount of mitigating evidence. At Kubat's post-conviction hearing, fifteen witnesses testified as to various positive aspects of Kubat's character. This long parade of witnesses did not include members of Kubat's family, whose testimony might easily be discounted. Rather, the expansive array of post-conviction mitigating witnesses consisted of neighbors and co-workers of Kubat, well-respected citizens in their community. These people had come to befriend Kubat, held him in high esteem, and expressed genuine disbelief that he could have committed murder. If these witnesses had appeared at Kubat's sentencing, their testimony would have made an impressive case for sparing Kubat's life. All fifteen of these witnesses stated at the post-conviction hearing that if Kubat's counsel had asked them, they would have testified on Kubat's behalf at his sentencing hearing. Kubat's attorneys, however, contacted only two of the fifteen witnesses before trial.

To compound the damage done by their inadequate investigation, Kubat's lawyers

---

included offense instruction. Moreover, such an instruction was not inconsistent with defendants' theory of self-defense. By contrast, Kubat's counsel never even considered requesting a lesser included offense instruction, primarily because the instruction would have conflicted with Kubat's alibi defense. Ultimately, Kubat

can point to no case, either in this state or in the federal courts, where neither the prosecution nor the defendant had requested a lesser included offense instruction, yet an appellate court ruled that the trial judge should have given the instruction.

never even asked the two witnesses whom they had contacted if they would testify at the sentencing hearing. In fact, following the State's presentation of aggravating evidence at Kubat's sentencing, defense counsel made no attempt to present any mitigating evidence to the jury. Not surprisingly, after comparing the aggravating evidence offered by the State with the total absence of mitigating evidence, the jury sentenced Kubat to death.

Although the complete failure of Kubat's counsel to investigate or present mitigating evidence would seem ineffective on its face, the U.S. Supreme Court has found that such conduct does not constitute ineffective assistance *per se.* So long as counsel pursues a reasonable alternative strategy at capital sentencing, the failure to investigate or present mitigating evidence is not constitutionally objectionable. *See, e.g., Strickland,* 466 U.S. at 699, 104 S.Ct. at 2070–71 (defense counsel reasonably opted to rely on sentencing judge's reputation for mercy instead of presenting mitigating evidence, which would have exposed defendant to damaging rebuttal evidence).[6] In the instant case, however, Kubat's lawyers can offer no rational strategic explanation for their behavior. With their client's life at stake, these attorneys quite simply failed to investigate or produce the only evidence that offered a realistic chance of saving Kubat from execution. Their abject failure stemmed not from a conscious decision to adopt an alternative strategy, but from sheer negligence. The Sixth Amendment will not tolerate such incompetence, particularly when a defendant's life hangs in the balance.

Despite the obvious ineptitude of defense counsel, the State attempts to portray the performance of Kubat's attorneys as reasonable under the circumstances. The State asserts that defense counsel did not offer mitigating evidence at sentencing because such evidence would have contradict-

ed Kubat's persistent profession of innocence. Since Kubat had maintained throughout his trial that he did not kill Lydia Hyde, "it was reasonable for counsel to elect not to present evidence regarding mitigating factors which imply guilt but which attempt to excuse that culpable conduct." *Funchess v. Wainwright,* 772 F.2d 683, 689–90 (11th Cir.1985), *cert. denied,* 475 U.S. 1031, 106 S.Ct. 1242, 89 L.Ed.2d 349 (1986). The evidence adduced at the post-conviction hearing, however, was not inconsistent with Kubat's insistence on his innocence. If anything, the testimony of the fifteen character witnesses would have bolstered rather than undermined Kubat's claim that he was not guilty. All fifteen witnesses voiced admiration for Kubat, and expressed disbelief that he could have committed the murder. Given the potentially powerful impact of this testimony and its consistency with Kubat's claim of innocence, defense counsel had no good reason to refrain from presenting this mitigating evidence.

■■■ Nonetheless, the State contends that the performance of defense counsel cannot be deemed ineffective because Kubat's lawyers employed a reasonable alternative strategy: an appeal to the jurors' religious beliefs in the closing argument, exhorting the jury to show compassion for Kubat. Admittedly, capital defense lawyers often resort to this tactic; and at least one court has ruled that a generic entreaty for compassion, unsupported by any individualized mitigating evidence, satisfies the constitutional standard for effective assistance. *See Coleman v. Brown,* 802 F.2d 1227, 1236 (10th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 2491, 96 L.Ed.2d 383 (1987). In Illinois, however, exclusive reliance on a plea for mercy amounts to a hopelessly ineffective defense strategy at capital sentencing. Even assuming that Kubat's counsel delivered a persuasive plea for mercy during his closing argument (an

---

**6.** *Strickland's* conclusion notwithstanding, several commentators have cogently contended that a defense attorney cannot render effective assistance at capital sentencing unless he investigates and presents mitigating evidence that portrays his client as a human being. *See, e.g.,*

Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases,* 58 N.Y. U.L.Rev. 299 (1983); Note, *Ineffective Assistance of Counsel at Capital Sentencing,* 39 Stan.L.Rev. 461 (1987).

assumption that requires a quantum leap of imagination), Illinois law left the jury with no choice but to sentence Kubat to death. The Illinois death penalty statute provides: "If the jury determines unanimously that there are no mitigating factors sufficient to preclude the imposition of the death sentence, the court shall sentence the defendant to death." Ill.Rev.Stat. ch. 38, para. 9–1(g) (1985). Based on the plain language of the statute, even the most eloquent plea for mercy cannot compensate for the absence of mitigating evidence: "When there is no mitigating factor for the court [or the jury] to weigh against an aggravating factor that has been found to exist beyond a reasonable doubt, the statute obligates the judge to impose the death sentence...." *People v. Owens*, 102 Ill.2d 88, 114, 79 Ill.Dec. 663, 675, 464 N.E.2d 261, 273 (1984).

Once the jury convicted Kubat of aggravated kidnapping, thereby finding the existence of an aggravating factor, Kubat's counsel "had the burden of coming forward with evidence of mitigating factors sufficient to preclude imposition of the death penalty." *People v. Olinger*, 112 Ill.2d 324, 351, 97 Ill.Dec. 772, 785, 493 N.E.2d 579, 592 (1986). Counsel could not reasonably expect to carry that burden merely by pleading with the jury to spare Kubat's life. The State's characterization of defense counsel's conduct notwithstanding, state law presented counsel with no reasonable alternative strategy but to offer mitigating evidence on Kubat's behalf. By failing to present the available mitigating evidence, Kubat's lawyers virtually assured that their client would receive a death sentence. Clearly, there was no method to this madness: "A total abdication of duty should never be viewed as permissible trial strategy." *Pickens v. Lockhart*, 714 F.2d 1455, 1467 (8th Cir.1983). The failure of Kubat's attorneys to investigate or present

mitigating evidence constituted ineffective assistance of counsel. *Cf. United States ex rel. Lewis v. Lane*, 656 F.Supp. 181, 194 (C.D.Ill.) (counsel's ineffectiveness stemmed in part from "his failure to individualize the petitioner as a human being, instead merely presenting an abstract religious argument"), *aff'd*, 832 F.2d 1446 (7th Cir.1987).

### ii) Closing Argument [7]

Even assuming that counsel's conduct amounted to a reasonable alternative strategy, the execution of that strategy fell far below acceptable standards of legal representation. All that stood between Kubat and a death sentence was his counsel's closing argument—a rambling, incoherent discourse that was more likely to confuse than to persuade the jury. In fact, counsel's "plea for mercy" (as the State has charitably characterized it) may actually have strengthened the jury's resolve to impose a death sentence. Toward the end of his closing argument, Kubat's attorney told the jurors to "decide the way you feel, Robert Kubat or Lydia Hyde." Tr. at 1711. Although its meaning is not entirely clear, this cryptic comment appears to be an invitation to the jury to compare the defendant with the victim. It was utter lunacy for defense counsel to invite such a comparison, which could only have benefited the prosecution. Thus, the closing argument only exacerbated the effect of counsel's failure to present mitigating evidence on Kubat's behalf.

### iii) Failure to Object to Erroneous Jury Instruction

Unfortunately for Kubat, his counsel's incompetence did not cease at the conclusion of the closing argument. His attorneys continued to demonstrate their inadequacy during the judge's instruction of the jury. In the course of his instruc-

---

7. The State asserts that this court should not consider Kubat's contention that his counsel's closing argument was ineffective. As the State points out, the Illinois Supreme Court has already ruled that Kubat waived this argument by failing to raise it on direct appeal. *Kubat II*, 114 Ill.2d at 438, 103 Ill.Dec. at 96, 501 N.E.2d at 117. The Court's waiver ruling, however, flies

in the face of the record in this case. As Justice Simon has noted, Kubat's brief on direct appeal clearly raised the issue of counsel's ineffective closing argument. *Id.* at 448, 103 Ill.Dec. at 101, 501 N.E.2d at 122 (Simon, J., dissenting). By attacking his counsel's closing argument in his initial appeal, Kubat has preserved his right to mount the same challenge before this court.

tions, the judge told the jurors: "If, after your deliberations, you *unanimously* conclude that there is a sufficiently mitigating factor or factors to preclude imposition of the death sentence, you should sign the form which so indicates. If you sign that verdict form, the Court will sentence the defendant to imprisonment." Tr. at CO 201 (emphasis added). This instruction egregiously misstated the law; far from requiring unanimity, Illinois law mandates a sentence of imprisonment even if only one juror votes to preclude the death penalty. *See* Ill.Rev.Stat. ch. 38, para. 9–1(g) (1985). The blatantly inaccurate instruction given at Kubat's sentencing severely crippled his chances of avoiding a death sentence. Even a marginally qualified defense attorney would have strenuously objected to such an instruction. Kubat's lawyers, however, made no effort to object. Though their silence effectively sealed their client's fate, it should have come as no surprise; the attorneys' inaction merely mirrored their conduct throughout Kubat's sentencing—a complete abdication of responsibility, resulting in ineffective assistance of counsel.

#### b. *Prejudice*

Without doubt, Kubat has satisfied the first *Strickland* requirement by establishing the deficiency of his counsel's performance at the sentencing hearing. Nonetheless, before Kubat can prevail on his claim of ineffective assistance at sentencing, *Strickland* also requires that he make a showing of prejudice. In order to obtain relief from this court, Kubat must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of [his sentencing hearing] would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068.

In gauging the likelihood of prejudice, the *Strickland* Court defined "a reason-

able probability" as "a probability sufficient to undermine confidence in the outcome." *Id.* Although it may be difficult for a defendant to establish such a probability, it is certainly not impossible, especially in a capital case. Just last year, federal judges in this state found defense counsel's multiple errors sufficiently prejudicial to justify the vacation of two death sentences. *See Gaines v. Thieret*, 665 F.Supp. 1342, 1370–71 (N.D.Ill.1987); *Lewis*, 656 F.Supp. at 194.

As in *Gaines* and *Lewis*, defense counsel in Kubat's case committed a variety of errors at sentencing, which combined to create a reasonable probability of prejudice. Considering the combined effect of counsel's grievous errors, this court cannot confidently state that, in the absence of those errors, the jury would still have sentenced Kubat to death. By avoiding the errors committed at sentencing, competent legal counsel might well have obtained a different result. After all, defense counsel needed to sway only one juror in order to alter Kubat's sentence. If the available mitigating witnesses had appeared at the sentencing hearing, their testimony would have humanized Kubat in the eyes of a jury that held his fate in its hands.[8] Following the presentation of this mitigating evidence, even a moderately persuasive plea for mercy in the closing argument might have convinced at least one juror to find a mitigating factor sufficient to preclude the death penalty. Finally, competent counsel would have objected to the erroneous jury instruction—an instruction that may have distorted the jury's deliberations by creating the mistaken impression that a sentence of imprisonment required the approval of all twelve jurors.

Considered in tandem, the errors of defense counsel cast serious doubt on the reliability of Kubat's sentence. Thus, Ku-

---

8. The State argues that because the mitigating witnesses knew little or nothing about Kubat's long history of criminal activity, these witnesses were susceptible to cross-examination and impeachment. Even so, the State's observation does not relieve this court's doubts regarding the reliability of Kubat's sentence. Whatever their weaknesses may have been, the mitigating witnesses would have revealed a benevolent, humane side of Kubat—a side that the jury never saw during the trial. If the jury had gained this new perspective on Kubat, it is less than clear that the jurors would have remained unanimously convinced that Kubat deserved the death penalty.

bat has satisfied Strickland's prejudice prerequisite. Having reviewed the events that transpired at his sentencing hearing, this court concludes that Kubat received ineffective assistance of counsel. In light of this violation of Kubat's Sixth Amendment rights, his death sentence cannot stand: "Justice does not permit the execution of a defendant who was effectively rendered no legal assistance at all...." *Kubat II*, 114 Ill.2d at 449, 103 Ill.Dec. at 101–02, 501 N.E.2d at 122–23 (Simon, J., dissenting).

### 3. *Erroneous Jury Instruction*

■■■■ Even if defense counsel's errors did not amount to ineffective assistance, Kubat would still be entitled to relief from his death sentence because the trial judge wrongly instructed the jury that a sentence of imprisonment, like a sentence of death, required unanimous juror approval. When such a plain error taints a sentencing hearing, the resulting sentence cannot stand unless the State demonstrates that the error was "harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). In the instant case, the State has failed to convince this court that the judge's error was clearly harmless.

In an effort to downplay the error's effect on Kubat's sentencing, the State urges this court not to examine the erroneous instruction in isolation, but to consider the jury instructions in their entirety. The State concedes that the jury received an inaccurate instruction, but contends that subsequent instructions—which correctly

stated the law—minimized the erroneous instruction's potential for harm. For instance, shortly after giving the erroneous instruction, the judge properly instructed the jury: "If after your deliberations one or more jurors conclude that the defendant should not be sentenced to death, all jurors shall sign the verdict reflecting the jury's inability to reach a unanimous verdict." Tr. at CO 202. In addition, the verdict forms that the jury took to the jury room accurately stated that Kubat would receive a prison sentence if the jury could not unanimously agree on the appropriateness of the death penalty.

In view of the fact that the jury instructions were conflicting rather than completely erroneous, the State asserts that the conflicting instructions could not have harmed Kubat unless they created confusion among the jurors. The State then speculates that the erroneous instruction could not possibly have confused the jurors because the jury returned a verdict of death in only 63 minutes. As further support for its assertion of harmless error, the State points to the Illinois Supreme Court's finding that the erroneous instruction resulted in no fundamental unfairness.[9] In assessing the error's impact, the Court tersely concluded: "[W]e cannot conceive that the jurors could have believed the death sentence verdict should be returned in the absence of complete agreement." *Kubat I*, 94 Ill.2d at 493, 69 Ill.Dec. at 55, 447 N.E.2d at 272.

Despite the State's reassurances, this court does not share the confidence of the state's highest court that the trial judge's

---

**9.** In fact, the State argues that this court should treat the Illinois Supreme Court's ruling on harmless error as a factual finding subject to a presumption of correctness under 28 U.S.C. § 2254(d). Such a showing of deference would require this court to expand the scope of *Patton v. Yount*, 467 U.S. 1025, 104 S.Ct. 2884, 81 L.Ed.2d 847 (1984). The U.S. Supreme Court ruled in *Patton* that a judge's evaluation of prospective jurors' impartiality during *voir dire* should be regarded as a finding of fact for purposes of habeas review. *Patton* thus achieved the questionable result of elevating a highly subjective judgment to the exalted status of a "factual finding."

This court sees no reason to extend the application of *Patton*'s dubious policy to judicial

assessments of a jury's state of mind. No human court can confidently divine the mental processes of the twelve individuals who comprise a jury, especially when the jurors receive conflicting instructions from the judge. A judicial determination of a jury's mental state lacks the reliability to justify the unquestioning acceptance of a reviewing court.

This court has a responsibility to subject the erroneous instruction in the instant case to meaningful scrutiny. By urging blind deference to a previous finding of harmless error, the State is inviting the court to abdicate its responsibility. This court declines the State's invitation.

error was unquestionably harmless. With all due respect to the Illinois Supreme Court, this court can conceive of a completely unacceptable scenario that the erroneous instruction may have spawned. The State argues that the absence of mitigating evidence did not foreclose the jury's option to vote against the death penalty. Assuming that this is correct, and given the awesome responsibility of deciding whether Kubat should live or die, it is not implausible that one of the twelve jurors entered the jury room with some doubts about sentencing Kubat to death, only to find that the other eleven jurors were determined to impose the death penalty. It is also possible that this sole dissenting juror was not at all "confused" by the conflicting jury instructions; he simply heard and relied on the erroneous instruction. Consequently, this juror mistakenly believed that he would have to persuade the rest of the jurors to change their minds in order to preclude the death penalty. Laboring under this misconception, and faced with eleven jurors who were convinced that Kubat deserved a death sentence, the dissenting juror would have quickly come to the conclusion that his objections were futile. Due to his misunderstanding of the law, this juror would have resigned himself to acquiescence in Kubat's death sentence, unaware that his solitary dissenting vote would have prevented imposition of the death penalty. This chilling scenario raises a reasonable doubt that the erroneous jury instruction could have cost Kubat his life.

Forty years ago, Justice Frankfurter warned of the dangers inherent in characterizing an erroneous jury instruction as "harmless" merely because the jury had also received an appropriate instruction:

A conviction ought not to rest on an equivocal direction to the jury on a basic issue.... The Government's suggestion [that the erroneous instruction was harmless error] really implies that, although it is the judge's special business to guide the jury by appropriate legal criteria through the maze of facts before

it, we can say that the lay jury will know enough to disregard the judge's bad law if in fact he misguides them. To do so would transfer to the jury the judge's function in giving the law....

*Bollenbach v. United States,* 326 U.S. 607, 613–14, 66 S.Ct. 402, 405, 90 L.Ed. 350 (1946). Although Frankfurter wrote these words in the course of reversing a conviction, his admonition applies with even greater force to a death sentence. When a capital jury receives contradictory instructions about sentencing, there is simply no way of knowing whether the jury has relied on the correct instruction or the erroneous instruction during its sentencing deliberations. In effect, the conflicting instructions allow the jury to usurp the judge's function by selecting which law shall apply. With a defendant's life at stake, a reviewing court cannot simply presume that a capital jury, when confronted with conflicting instructions, selected and applied the correct law in arriving at its sentence. A jury's imposition of the ultimate penalty under these circumstances is completely unacceptable; the jury's assumption of a judicial role undermines the painstaking procedural safeguards built into the capital sentencing process. Consequently, the judge's erroneous instruction to the jury provides another basis for vacating Kubat's death sentence.

### 4. *Constitutionality of the Illinois Death Penalty Statute*

 Finally, Kubat's petition challenges the constitutionality of the Illinois death penalty statute. Because this court has already decided to vacate Kubat's death sentence on narrower grounds, it would be inappropriate for the court to address the larger issue of the statute's constitutionality.[10] *See Parker v. County of Los Angeles,* 338 U.S. 327, 333, 70 S.Ct. 161, 164, 94 L.Ed. 144 (1949) ("The best teaching of this Court's experience admonishes us not to entertain constitutional questions in advance of the strictest neces-

---

10. Under similar circumstances, Judges Plunkett and Baker also declined to rule on the constitutionality of the Illinois statute. *See Gaines,*

665 F.Supp. at 1371–72; *Lewis,* 656 F.Supp. at 195.

**816**

sity."); *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) ("The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of.").

The parties, however, should not construe this court's abstention as an affirmation of the statute's constitutionality. Kubat's arguments raise some troublesome questions about the Illinois Death Penalty Act. For instance, the Act empowers prosecutors with wide-ranging post-conviction discretion to decide whether or not to seek the death penalty. Because the statute imposes few if any constraints on this exercise of prosecutorial discretion, it is unclear whether Illinois law adequately guards against the sort of arbitrary and capricious application of capital punishment that the Supreme Court condemned in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). *See Lewis,* 656 F.Supp. at 195.

In addition, the Illinois statute may offend the constitutional prohibition against nondiscretionary capital sentencing. The Supreme Court has repeatedly emphasized the need for an individualized sentencing determination in each particular capital case. *See, e.g., Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed. 2d 1 (1986); *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). In keeping with this principle, the Court has consistently struck down statutory provisions for a mandatory death penalty, ruling that such provisions violate the Eighth and Fourteenth Amendments. *See Sumner v. Shuman,* —— U.S. ——, 107 S.Ct. 2716, 97 L.Ed.2d 56 (1987); *Roberts (Stanislaus) v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976); *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). The Illinois statute seems to clash with these precedents by mandating the imposition of a death sentence in the absence of mitigating evidence. *See Owens, supra.* In a case where no mitigating evidence is presented, the statute deprives a capital jury of the discretion to preclude the death penalty—even if the jury believes that the State's aggravating evidence does not justify a death sentence. This feature of the Illinois Death Penalty Act could leave the statute vulnerable to constitutional attack.

In the instant case, however, any constitutional challenge to the Illinois statute is moot; this court has already granted Kubat relief from his sentence. Thus, although Kubat has raised serious questions about the constitutionality of the Illinois death penalty statute, resolution of those questions must await another day.

## III. CONCLUSION

Having rejected Kubat's arguments concerning the sufficiency of evidence introduced at trial, the reliability of identification testimony stemming from photographic identification procedures, and the legal assistance he received at trial, this court finds no reason to vacate Kubat's convictions. On the other hand, Kubat has advanced two compelling reasons for this court to overturn his death sentence. First, Kubat received ineffective assistance of counsel at his sentencing hearing. Second, the judge erroneously instructed the jury that a sentence other than death would require the jury's unanimous approval.

For the foregoing reasons, this court grants Kubat's petition with respect to his death sentence, but denies the petition in all other respects. This court hereby vacates Kubat's sentence of death. The State shall have 120 days from the issuance of this order to resentence Kubat.

On this court's own motion, execution of this order is stayed pending appeal by the parties.

IT IS SO ORDERED.